# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JAVON S. JONES,       *

     Plaintiff,       *

     v.       *       **CIVIL NO. JKB-17-3500**

UNITED HEALTH GROUP,       *

     Defendant.       *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM

Plaintiff Javon S. Jones filed suit against her former employer, Defendant UnitedHealth Group[1] ("UHG"), alleging race-based discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a).  Currently pending before the Court is Defendant's motion for summary judgment on all counts of the complaint.  (ECF No. 13.)  No hearing is required.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons set forth below, Defendant's motion will be granted.

## I.    *Factual Background*

Jones was employed as a Healthcare Data Business Analyst for Optum Shared Services, a division of UHG, from October 6, 2014, until May 4, 2016.  (Def. Exh. 1, at 1, ECF No. 13-3; May 4 Entry, Def. Exh. 26, ECF No. 13-28.)  Jones was part of the Coordination of Benefits (COB) Analytics group, which, at the time of hire, was composed of a team of business analysts and a team of data analysts.  (R. Christman Dep. at 32:13–21, Pl. Exh. 2, ECF No. 14-2.)  Jones, who is African American, was on a small team of business analysts overseen by a manager,

---

[1]    The Complaint styled the employer's corporate name as "United Health Group," but Defendant's filings indicate that the company does not use a space between "United" and "Health."

Robin Christman. (*Id.* at 61:3–13 (naming nine team members); *cf.* J. Jones Dep. at 46:19–23, Def. Exh. 3, ECF No. 13-5.) In her role, Jones analyzed process requests, identified by ticket numbers, and wrote business requirements documents. (Jones Dep. at 40:14–24.) On certain tickets, a data analyst would also be assigned. (*Id.*) Sometime during Jones's first year, the COB Analytics Group adopted a new request intake system, known as "PAWS."[2] (Christman Dep. at 121:8–11; R. Robertson Dep. at 65:13–16, Pl. Exh. 3, ECF No. 14-3.) Once a request was assigned, the business analyst logged status updates on progress in the PAWS system, including whether a data analyst was required. (Robertson Dep. at 67:19–71:17.)

In June 2015, Jones had a mid-year evaluation. (Def. Exh. 5, ECF No. 13-7 [hereinafter "Interim Review"].) Christman scored Jones on a five-point scale across ten metrics and in an overall rating. (*Id.*) Jones received a rating of "3" ("Effective") on most metrics, except she had one "5" rating ("Outstanding") and two "2" ratings (between "Marginal" and "Effective").[3] (*Id.* at 1, 3–4.) Christman gave her an overall score of "3," in the "Meets Expectations" range, and provided the following comments: "Overall, [Jones] is meeting the expectations of the [business analyst] position. She should look for ways to expedite completing projects[;] as we take on more requests she will be expected to increase her through put [*sic*]. She should review any challenges she has faced thus far and look for ways to eliminate them." (*Id.* at 5.)

In early July 2015, Jones reported sexual harassment allegations involving a data analyst, D.U., making unwelcome comments about her appearance, "look[ing] [her] up and down," staring at her during meetings, and contriving reasons to come by her desk unnecessarily. (Def. Exh. 6, at 2, ECF No. 13-8.) As a result, she felt "uneasy about meeting with him face to face" and "extremely uncomfortable working with him." (*Id.*) Christman reported the allegations to

---

[2]  PAWS is an acronym, but the record does not disclose the full name.

[3]  The Review form does not contain a rubric elaborating on the scores, beyond the category names.

human resources and D.U.'s supervisor. (Christman Dep. at 39:16–40:7.) According to UHG records, after D.U. denied most of the allegations, his supervisor "coached" him about the anti-harassment policy, and the case was closed. (July 10 Entry, Def. Exh. 7, ECF No. 13-9.) With Jones's consent, Christman relocated her to a new desk and told her "she would not have to work with [him]." (Christman Dep. at 42:15–19, 43:18–19; *accord* Jones Dep. at 80:3–5.)

At some point in 2015, Christman noticed Jones was away from her desk at times without explanation and discussed it with her. Jones said she had a medical condition that sometimes required her to be in the bathroom for long periods. (Christman Dep. at 44:7–11; Jones Dep. at 54:4–9, 55:14–19.) The parties dispute whether Jones was referred to information about medical accommodations but agree she did not seek or receive a formal accommodation. (Christman Dep. at 44:11–45:15; Jones Dep. at 54:12–19.)

In late 2015, the COB Analytics Group began a restructuring process; Christman's team was split, and a second manager, Robin Robertson, was hired to oversee the additional team. (Christman Dep. at 61:22–62:8; Robertson Dep. at 25:11–15.) Christman retained several members of her former team to create a new "hybrid team" focused on larger-scale projects and code-writing. (Christman Dep. at 62:12—63:13.) Robertson's team was made up of transfers from the former team and new hires. (Robertson Dep. at 26:21–28:12.) Jones was transferred to Robertson's team. (*Id.* at 30:3–7.) Christman remained the official supervisor for all business analysts until after annual reviews in February 2016, but Robertson began acting in practice as a supervisor by January. (Christman Dep. at 64:2–8; Robertson Dep. at 29:3–31:18, 51:16–22; Jones Dep. at 114:8–9; *see also* Def. Exh. 15 (enforcing UHG policies in early January).)

Also in late 2015, Jones became eligible for internal transfers, and she notified Christman of her interest in applying. (Christman Dep. at 52:14–22; Jones Dep. at 160:9–13.) In

December, she told Robertson about an upcoming interview. (Def. Exh. 12, ECF No. 13-14.) In or around January 2016, Jones went on three interviews for a position. (Jones Dep. at 161:6–20.)

Jones's Title VII claims derive mostly from incidents between February and May 2016. The first occurred on February 10, 2016. UHG had a policy that permitted employees in good standing to telecommute with manager approval. (Def. Exh. 13, ECF No. 13-15.) The policy delegated discretion to supervisors to determine frequency and approval requirements. (*Id.* ¶ 1; *accord* Christman Dep. at 26:19–20.) Requirements varied across departments. (Robertson Dep. at 34:7.) In February 2016, employees in the COB Analytics Group were permitted to regularly work from home one day each week.[4] (Christman Dep. at 26:20–27:4; *accord* Robertson Dep. at 34:8–12; *cf.* Jones Dep. at 104:6–8.)

Jones arranged to telecommute on February 11, 2016, to catch an evening flight. (Def. Exh. 14 at 4, ECF No. 13-16 [hereinafter "Feb. 10 Emails"]; Robertson Dep. at 47:15–48:4.) On February 10, Jones decided to work from home because of icy road conditions. (Feb. 10 Emails at 3.) Mid-day, Robertson forwarded an email about the inclement weather policy to Jones and informed her that, because she was working from home that day, she would need to report to the office the following day, when she had planned to telecommute. (*Id.* at 4.) The forwarded email was from Coy Page, a director to whom Christman and Robertson reported. (Christman Dep. at 87:12–13; Robertson Dep. at 84:16–17.) Time-stamped five minutes before Robertson's email, Page's email stated that employees could work from home due to inclement weather but that, "[i]f this day is different from the day you would typically work from home[,] you will need to make arrangements to be in the office on the normal [] day." (Feb. 10 Emails at 4–5.) Jones told Robertson that she believed the practice had always allowed employees to work from home

---

[4]     The record does not contain written documentation of how discretionary features were applied, and some aspects of its history are in dispute. But, the parties agree that, in 2016, employees were allowed one telecommuting day per week. (Jones Dep. at 103:19–104:8; Christman Dep. at 26:20–27:2; Robertson Dep. at 34:8–12.)

if they felt unsafe commuting in winter weather. (*Id.* at 4.) She also wrote that "certain people receive certain privileges that are not afforded to everyone." (*Id.* at 3.)

Jones then looped Page into the chain and reiterated her feeling that "certain people" were treated differently. (*Id.*) She mentioned two co-workers: Jones said that L.B.W. "would work from home and/or leave early on several occasions" and be "allowed to make up [missed] time," but that S.A. had her telecommuting privileges revoked when she was "out due to illness." (*Id.*) S.A. is black, and L.B.W. is white. (Robertson Dep. at 86:18–22.) Jones concluded her email by asking "in what situation or what type of person I have to be in order to be afforded [the] ability to work from home without negative consequences." (Feb. 10 Emails at 3.) Page responded, saying that details about individual employees are "confidential"[5] but that the policy under which telecommuting due to weather would "count as the flex day for that week" had been in place "for several years." (*Id.* at 2.) Jones reported to the office early on February 11 and left early for her flight. (Jones Dep. at 128:25–129:18; *cf.* Robertson Dep. at 147:7–8.)

The record is devoid of any evidence that Page's explanation of the interaction between telecommuting and inclement weather was memorialized in writing prior to the February 10 email. Page's response to Jones included language purportedly copied from a company website, but that text only states that inclement weather is an "acceptable reason[] for informal telecommuting" and that "ad-hoc instances of informal telecommuting . . . remain at the manager's discretion." (Feb. 10 Email at 2.) UHG denies that employees were previously allowed to work from home in bad weather and on their regular day. (*E.g.*, Robertson Dep. at 39:4–22; *contra* Jones Dep. at 128:14–24.) Jones concedes that she is not aware of any employee being permitted to do so after February 11, 2016. (*Id.* at 128:15–19.)

---

[5]     It is undisputed that S.A.'s privileges were "rescinded" in January. (Def. Exh. 15 at 1, ECF No. 13-17.) UHG disputes the accuracy of Jones's examples otherwise. (Reply at 4, 6, ECF No. 15.)

Two weeks later, Jones had her annual review. (Def. Exh. 16, ECF No. 13-18 [hereinafter "Common Review"].) Both Robertson and Christman participated in the review meeting.[6] (Robertson Dep. at 99:12–15; Jones Dep. at 132:4–8, 161:21–24.) Jones again received an overall rating of "3," or "Meets Expectations." (Common Review at 5.) The comments in the summary section read:

> Overall Javon is meeting the expectations of the business analyst role. She should continue to work on increasing her knowledge of the membership and claims across the different clients and platforms[;] this will prove beneficial when working with the customer. Javon should not hesitate to engage her team members for help when faced with a situation she is not able to resolve. Javon's leadership, time and effort on the volunteer activities was vital to the success of each activity in 2015. Thank you!

(*Id.*) On individual metrics, her scores remained consistent with her Interim Review with two exceptions: on two metrics, her score decreased from a "3" to a "2." (*Id.* at 1–4.) Specific comments in that section contain both praise and criticism, most notably, that Jones "should stay more focused on her projects and spend less time surfing the Internet." (*Id.* at 4.)

Less than a month later, on March 16, 2016, Jones was placed on a "Corrective Action Process" ("CAP"). (Def. Exh. 17, ECF No. 13-19 [hereinafter "CAP Form"].) According to UHG policy, CAP is designed for employees who "do not meet performance goals or follow company policy," in order to "help [them] understand and correct [their] performance and/or behavior." (Def. Exh. 20 at 2, ECF No. 13-22 [hereinafter "CAP Policy"].) CAP has three levels: an initial warning, an elevated warning, and a final warning. (*Id.*) "[T]he various warning levels are not necessarily progressive," and the company may "skip levels" or take direct disciplinary action, including "termination," at any time. (*Id.*) Employees with an open CAP are not eligible for internal transfers. (Jones Dep. at 163:21–23.)

---

[6] According to their depositions, Christman authored the review and shared it with Robertson, who "agreed to it" but did not add any comments. (Robertson Dep. at 100:1–7; *see also* Christman Dep. at 90:20–22.)

Jones's CAP was opened at the initial warning level, and the listed reason was "Job Performance." (CAP Form at 1.) The form details performance issues, including the following:

> Javon is not meeting performance expectations. Specifically[,] she is failing to meet project deadlines and is lacking follow through [*sic*]. Javon has excessive cell phone use in the manner in which she is playing games as well as being on the internet. There have been communication gaps in reference to hours worked and extended periods of time away from her work area. She lacks the adaptability to change and innovation.

(*Id.* at 1–2.) The comments also gave examples of several PAWS requests that lacked "status updates" and took "an extreme amount of time" to complete. (*Id.* at 2.) Robertson is named as the "Originating Manager" (*id.* at 1), but Christman also participated in CAP-related meetings, including on March 16, 2016. (*See* Christman Dep. at 125:10–17; Jones Dep. at 210:8–13.) In the meeting, Jones disputed the performance criticisms and made verbal accusations that the CAP was racially motivated. (Robertson Dep. at 180:14–22; Jones Dep. at 143:15–21.)

On March 22, Jones reported her concerns internally. (Mar. 22 Entry, Def. Exh. 22, ECF No. 13-24.) Jones reported that white employees used phones and the internet excessively and took more breaks than she did, and that, when she asked if Christman and Robertson monitored everyone as closely as they monitored her, Robertson replied, "[we] can't watch everybody." (*Id.*) Jones also alleged that a white employee was promoted to a leadership role without others being given a chance to apply. (*Id.*) Jones admitted that she left her work station without notifying her supervisor, but she claimed she did so to work in a quieter area. (*Id.*) She denied using her phone or the internet excessively and said she could not have missed project deadlines because she was never given "deadlines associated with [her] work." (*Id.*)

On March 24, Jones filed an Internal Dispute Resolution (IDR) complaint contesting the decision to initiate the CAP and again accusing Robertson and Christman of racial bias. (Def. Exh. 23, ECF No. 13-25 [hereinafter "IDR File"].) Her complaint responded to specific issues

raised on the CAP form and provided copies of emails related to tickets the CAP form cited.  (*Id.* at 3–5.)  She reiterated her claims that "white employees are given more opportunities and are not held to the same standards that black employees are," and that, as a "daily occurrence," "white employees take extended breaks, us[e] the internet and cell phones excessively," and have "excessive and distracting" personal conversations without being disciplined.  (*Id.* at 5.)

That same day, Robertson informed Jones that D.U. would be the data analyst for one of her tickets.  (Pl. Exh. 8, ECF No. 14-8.)  Jones objected and told Robertson, "I am not to work with [D.U.] on any projects."  (*Id.*)  According to internal notes, on April 4, 2016, Robertson advised Jones that another analyst would be assigned, but that, because "there were no official findings" of harassment, in the future, she "would have to" work with D.U. "if business needs arise . . . where [he] is the only person available."  (Pl. Exh. 9, ECF No. 14-9.)

Jones was notified on April 13, 2016, that an internal investigation did not substantiate her discrimination complaint.  (Apr. 13 Entry, Def. Exh. 22.)  On April 25, Page informed Jones by letter that his IDR investigation found the CAP "solely related to performance-based outcomes," with "no evidence" of race-based motives.  (Def. Exh. 25 at 2, ECF No. 13-27.)  The letter concluded, "your requested resolution of having the CAP removed from your file is denied," "there is no further appeal available," and "the case is now closed."  (*Id.* at 3.)

On May 4, 2016, Jones gave notice of her resignation, and UHG released her that day.  (Def. Exh. 30, ECF No. 13-32; May 4 Entry, Def. Exh. 26; Robertson Dep. at 204:16–18.)  Jones filed a complaint with the Equal Employment Opportunity Commission (EEOC) and received a right-to-sue notice on August 30, 2017.  (Compl. ¶ 7, ECF No. 1.)  She filed suit in this Court on November 25, 2017, alleging three claims under Title VII: constructive discharge, hostile work environment, and retaliation.  (*Id.* at 10–15.)

## II. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The moving party bears the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the non-moving party, then a genuine dispute of material fact exists, and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient. *Id.* at 252. The non-moving party may not rest upon the pleadings but instead must, by evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Where a genuine dispute exists, the facts and inferences derived therefrom must be viewed in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2009).

## III. Analysis

### A. Rule 56

As a preliminary matter, the Court notes that the Plaintiff's opposition brief is woefully deficient in citations to the factual record. The argument section of the brief contains only two citations to the record. (Opp'n M.S.J. at 13–14, ECF No. 14 (citing ECF No. 13-19 at 4).) It otherwise presents arguments rooted solely in Jones's version of events, without citations to evidence. The fact section contains more citations, but some of these are to entire exhibits without pincites. (*See, e.g.*, *id.* at 5 (citing to deposition transcripts between 25 and 150 pages in length).) In other places, the brief cites deposition testimony that does not support the associated

factual assertions. For example, assertions about L.B.W.'s work-from-home status are supported with citations to testimony from co-workers and Jones herself (*id.* at 4, 8–9), but none of these deponents assert personal knowledge of L.B.W.'s working arrangements with UHG. Later, the brief again cites Jones's own deposition to support the assertion that Robertson made the D.U. assignment "*because* [Jones] 'filed the appeal and the discrimination case.'" (*Id.* at 10 (emphasis added) (quoting Jones Dep. at 214:18–19).) Jones's opinion is not competent evidence of Robertson's intent. Other assertions about Jones's transfer application and internal complaints filed against her are made without any citation to the record at all. (*Id.* at 4, 7.) And, at least one unsupported assertion—that Jones "earned a score of 5" on a certain metric in her Interim Review (*id.* at 6)—is contradicted by documentary evidence in the record. (Interim Review at 2 (showing a score of "3" on that item).) The Court is troubled by the inattention to and sloppy construction of the factual record in the opposition brief.

Rule 56 requires parties to support summary judgment arguments with sufficient citations to the record. Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed *must* support the assertion by [either] . . . citing to particular parts of materials in the record, . . . [or] showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." (emphasis added)). Failure to cite admissible evidence is especially perilous where, as here, the non-moving party is the plaintiff, who bears the ultimate burden of persuasion. *See Weathersbee v. Balt. City Fire Dep't*, 970 F. Supp. 2d 418, 431 (D. Md. 2013) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989)). Where a party fails to adequately support a factual assertion, the court may "consider the fact undisputed for purposes of the motion, [or] . . . grant summary judgment," if the opposing party makes an adequate showing of entitlement to it. Fed. R. Civ. P. 56(e)(2)–(3). Were the Court to strictly confine itself to arguments supported by

appropriate citations to the record, only a small fraction of the opposition brief would be considered. Because the Court prefers to dispose of cases on their merits, however, the Court will exercise its discretion to consider materials in the record outside of those cited by the parties. Fed. R. Civ. P. 56(c)(3).

### B. Title VII Claims

Jones relies on the *McDonnell Douglas* burden-shifting framework to make her claim. (Opp'n M.S.J. at 16.) *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This approach involves "three stages at which the burden of evidentiary production is shifted back and forth between the plaintiff and defendant." *Weathersbee*, 970 F. Supp. 2d at 431. Although the production burden shifts, the "'ultimate burden of persuasion'" always remains with the plaintiff. *Id.* (quoting *Cerberonics, Inc.*, 871 F.2d at 456 n.2).

In the first stage of *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination or retaliation. *Id.* (citing *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010)). Although "the precise formulation" of the prima facie case varies based on the facts, *id.* (citing *McDonnell Douglas*, 411 U.S. at 802 n.13), a plaintiff generally must show "that the employer took adverse action against the plaintiff 'under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Once the plaintiff establishes a prima facie case, "a presumption of discrimination arises." *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 581 (D. Md. 2002) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

In the second stage, the employer must "articulate a legitimate nondiscriminatory reason for the adverse employment decision." *Id.* (citing *Hicks*, 509 U.S. at 507). "Because the employer's burden is one of production and not of persuasion, [the employer] 'is not required to

11

prove absence of a discriminatory motive, but [must] merely articulate some legitimate reason for its action.'" *Id.* (quoting *EEOC v. Clay Printing Co.*, 995 F.2d 936, 941 (4th Cir. 1992)). If the employer articulates such a reason, "the presumption of discrimination is eliminated." *Id.*

In the third stage, the plaintiff must "put forth evidence that, if believed, could convince a finder of fact that the employer's purported reasons were pretextual, and that the actual basis for its employment decision was" unlawful. *Weathersbee*, 970 F. Supp. 2d at 434. A plaintiff may be able to show pretext by adducing evidence that the employer's stated reason is false, because, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *see also Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011).

In moving for summary judgment, UHG argues that Jones cannot establish a prima facie case under any of her claims and that, even if she could, she cannot offer evidence of pretext to rebut UHG's legitimate explanations. (M.S.J. Mem. at 16, 28, ECF No. 13-1.) The Court agrees that Jones failed to make a prima facie showing of constructive discharge or hostile working conditions but concludes that evidence of retaliation presents a closer call. Even assuming Jones made a prima facie case of retaliation, however, the Court finds that she has not rebutted UHG's non-retaliatory explanations nor provided evidence of pretext. Because Jones failed to carry her burden under *McDonnell Douglas* on any of her counts, UHG is entitled to summary judgment.

### 1. Constructive Discharge (Count I)

To establish a prima facie case of discrimination, a plaintiff must produce evidence that: (1) she is a member of a protected class; (2) she was performing her duties in a satisfactory manner that met the employer's legitimate expectations; (3) she was nonetheless subjected to an adverse employment action; and (4) "circumstances surrounding the adverse employment action

rationally support the inference that [it] was motivated by unlawful considerations." *Chika*, 179

F. Supp. 2d at 581 (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th

Cir. 1995)); *see also Burdine*, 450 U.S. at 253. Jones relies on the constructive discharge theory

in arguing that she suffered an adverse action. (Opp'n M.S.J. at 17–18.)[7]

Constructive discharge applies where circumstances render an employee's resignation

"tantamount to an actual discharge." *Green v. Brennan*, 136 S. Ct. 1769, 1776–77 (2016) (citing

*Pa. State Police v. Suders*, 542 U.S. 129, 142–43 (2004)). A plaintiff must show: (1) that

discrimination created "working conditions so intolerable that a reasonable person in the

employee's position would have felt compelled to resign," *Green*, 136 S. Ct. at 1776 (quoting

*Suders*, 542 U.S. at 141); and (2) that the employee actually resigned, *id.* at 1777.[8] It is

undisputed that Jones resigned. But, she fails to meet the first prong.

Intolerable conditions must be "objective[ly]" intolerable. *Consol Energy*, 860 F.3d

at 144. This is a "high standard, and even truly awful working conditions may not rise to the

level of constructive discharge." *Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 438 (D.

Md. 2012) (citing *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 783 (D. Md. 2010));

*see also Bowen v. Md. Dep't of Pub. Safety & Corr. Servs.*, Civ. No. RDB-17-1571, 2018

WL 1784463, at *9 (D. Md. Apr. 12, 2018). To establish objective intolerability, Jones argues

that her supervisors "unfairly placed [her] on a CAP," "suggested that she could be forced to

work with an individual who had previously harassed her," and "inconvenienced" her by denying

---

[7]     UHG also argues that the CAP, the D.U. assignment, and denials of work-from-home requests are not
adverse actions as a matter of law. (M.S.J. Mem. at 17–19.) Jones did not argue that these incidents alone would be
actionable. Thus, the Court will confine its analysis to her exclusive theory under Count I—constructive discharge.

[8]     UHG incorrectly argues that "deliberateness" is also an element of the test. (M.S.J. Mem. at 19.) It is not.
The *Green* majority "expressly rejected" that constructive discharge requires proof "'that not only was the
discrimination so bad that [the employee] had to quit, but also that [her] quitting was [her] employer's plan all
along.'" *EEOC v. Consol Energy*, 860 F.3d 131, 144 (4th Cir. 2017) (quoting *Green*, 136 S. Ct. at 1179–80).

her request to work from home.  (Opp'n M.S.J. at 18.)  Taken in isolation or collectively, none of these rises to the high threshold of objective intolerability.

### a.  Corrective Action Process (CAP)

Jones first argues that the CAP created objectively intolerable conditions because it was based on "unfair[]" performance criticisms, because she "was not warned or investigated prior" to institution of the CAP, and because colleagues who engaged in similar conduct were not placed on a CAP.  (*Id.*)  The Court need not decide whether the evidence supports an inference that performance criticisms in the CAP were unjustified, because, even if so, "a feeling of being unfairly criticized . . . [is] not so intolerable as to compel a reasonable person to resign."  *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 187 (4th Cir. 2004) (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004)); *see also Melendez v. Bd. of Educ. for Montgomery Cty.*, 711 F. App'x 685, 688 (4th Cir. 2017) (per curiam) (unpublished) (rejecting a constructive discharge claim based on "disagreement with [a] negative performance evaluation[]").

The collateral consequences of the CAP do not establish objective intolerability, either.  Constructive discharge may occur where "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated . . . ."  *EEOC v. MVM, Inc.*, Civ. No. TDC-17-2864, 2018 WL 2197727, at *12 (D. Md. May 14, 2018) (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)).  Here, the CAP Policy states that, even at the "initial warning" level, termination is a possibility.  (*See* CAP Policy at 2.)  But, Jones offers no evidence that she was ever threatened with termination.  (Jones Dep. at 203:12–16 (responding that she "[didn't] recall if [she] was" ever "told that [she was] going to be terminated").)  The mere possibility of termination in unspecified future circumstances is not enough to signal that Jones faced "inevitabl[e]" termination.  *MVM, Inc.*, 2018 WL 2197727,

at *12.  Notes in Jones's CAP file also indicate that her supervisors considered her performance to be improving in the weeks prior to her resignation.  (CAP Form at 4 (noting properly logged PAWS updates in April and "improving" communication in May).)  These notes undermine any claim that imminent termination was apparent from the circumstances.

Jones also argues that the CAP "precluded [her] from obtaining internal positions" to which she had applied.[9]  (Opp'n M.S.J. at 14.)  But, Jones cites no case law finding a temporary inability to pursue transfers to be objectively intolerable.  In other Title VII contexts, denial of transfer opportunities is not an adverse action.  *See, e.g.*, *Melendez*, 711 F. App'x at 688 ("[T]he loss of an ability to seek a reassignment . . . does not constitute an adverse employment action.").  And, even if it were, Jones provided no evidence that the CAP had more than a theoretical impact on her ability to transfer.  Jones testified that a recruiter promised to "follow up" with her after she interviewed in January, but that she "never heard anything else" after being put on the CAP.  (Jones Dep. at 18:7–13.)  This is not enough to suggest that she would have gotten the position, if not for the CAP.  As Jones admits, she "never got a status" update one way or the other.  (*Id.* at 17:10–14.)  The Court cannot infer from this evidence that Jones was still being considered for the position by the time of the CAP (which was two months after her interviews), or that she had been officially rejected for it by the time she resigned.[10]

Even assuming that an employer could use false or exaggerated performance criticisms to unreasonably hijack a high-performing employee's opportunities to advance, and assuming further that the situation could persist to the point of objectively intolerability, this is not such a case.  Jones admits she made no effort to change or improve her performance after being placed

---

[9]      The record does not reveal a written policy reflecting this rule.  UHG does not dispute Jones's description of this consequence, and, for the purpose of this motion, the Court will assume such a restriction existed.

[10]     Jones identifies no other position to which she would have applied, if not for the CAP.  (Jones Dep. at 18:18–24.)

on the CAP. (*Id.* at 204:12–13 ("I continued doing my job the way I've always done it. I did not change anything."); *id.* at 217:7–10 (affirming that her "performance never changed" after the CAP).) And, despite her admitted lack of effort, Robertson rated her performance as improving. (*See* CAP Form at 4.) Thus, the Court cannot infer that Jones was stuck in an impossible situation with no end in sight. Even if Jones could bring forward evidence that the imposition of the CAP was objectively unjustified by her actual performance and that it denied her material opportunities for advancement, these other facts would undercut any claim that the situation approached the high threshold of objective intolerability.[11]

At most, Jones provided evidence that she believed that the CAP was not justified by her performance, that she feared it could be used to fire her, and that it denied her speculative opportunities for advancement. Such circumstances do not amount to constructive discharge.

### b. Assignment to Work with D.U.

Jones also attributes her resignation to the fact that UHG "[was] going to force [her] to work with a man [who] harassed [her]." (Jones Dep. at 244:8–9.) UHG argues that, even if Jones had been required to work with D.U., a "less favorable" assignment is not an adverse event. (M.S.J. Mem. at 19 (quoting *Bailey v. Ares Grp., Inc.*, 803 F. Supp. 2d 349, 358 (D. Md. 2011)).) While the Court considers a requirement to work closely with an alleged harasser to present a more serious imposition than the Defendant's characterization of it as a mere,

---

[11]    Nor does evidence of fraught and deteriorating interpersonal dynamics between Jones and colleagues alter the conclusion. (*See* Jones Dep. at 88:2–14, 91:19–25 (describing colleagues as "standoffish" and as ganging up on her in meetings); Christman Dep. at 127:23 (describing CAP meetings as "very tense").) "[D]ifficult or unpleasant working conditions" are not a basis for constructive discharge. *Honor*, 383 F.3d at 187 (quoting *Giant Food*, 370 F.3d at 434); *see also Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997) (holding that, "being ignored both by . . . co-workers and by the top supervisor" did not establish constructive discharge); *Giant Food*, 370 F.3d at 434 (denying constructive discharge claim where the plaintiff's "supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back"); *Bowen*, WL 1784463, at *9 (rejecting a claim where an employee was subjected to disciplinary charges, ridicule, abuse, and denial of health benefits).

"unfavorable" assignment, the Court nonetheless concludes that, under the facts of this case, the situation did not create objectively intolerable conditions.

The Court will not rule out that being forced to work closely with a colleague whom an employee accused of sexual harassment less than a year before might, in some circumstances, result in an environment so intolerable as to compel a reasonable person to resign. Nor will the Court rule out that objective intolerability might result even if an employer declared the prior complaint unsubstantiated; other factors—such as the severity of the allegations, the robustness of the internal investigation, or indications that the employer considered the allegations to be credible—could suggest an unacceptably high risk of repeated harassment notwithstanding the formal conclusion.[12] In this case, however, the Court need not evaluate such factors, because Jones was not in fact required to work with D.U. (Jones Dep. at 87:8–12.)

Jones argues that, even though the assignment was rescinded, UHG left open the possibility that "she could be forced to work" with D.U. in the future. (Opp'n M.S.J. at 18; *see also* Pl. Exh. 9.) But, she provides no evidence to suggest such a situation was likely to occur, let alone that it was imminent. She acknowledged that there were not "any specific plans" for such an assignment when she resigned. (Jones Dep. at 81:20–23; *see also* Robertson Dep. at 199:11–13 (stating her opinion that the likelihood of D.U. being the only data analyst available was "next to never").) Even if being assigned to work closely with a co-worker who was recently accused of harassment could create objectively intolerable conditions in some cases,

---

[12] Here, UHG's investigation appears to have involved a single conversation in which D.U. denied most of the allegations, after which the case was closed as a "he said she said situation [*sic*]," a conclusion that suggests UHG neither substantiated nor discredited the complaint. (July 10 Entry, Def. Exh. 7.) And, UHG appears to have taken it seriously enough to warrant at least some remedial action, including "coaching" D.U. about the policy (*id.*), relocating Jones's workspace away from him (Christman Dep. at 42:18–19), and refraining from assigning Jones and D.U. to the same project for the next nine months (*id.* at 124:17–20). These facts do not affect the outcome here, for the reasons discussed in the opinion, but it is worth noting that UHG's determination that the complaint was "unsubstantiated" is not the dispositive factor.

here, Jones only adduced evidence that such conditions *might* arise later.[13]  Speculation about a

situation that might arise in the future does not meet the high bar for constructive discharge.  *Cf.*

*Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (quoting *Davis v. Town of Lake*

*Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)) ("[The] impact [of an adverse action] cannot be

speculative."); *Aquilino v. Univ. of Kansas*, 268 F.3d 930, 936 (10th Cir. 2001) ("Speculative

harm does not constitute adverse employment action."); *Probst v. Ashcroft*, 25 F. App'x 469, 472

(7th Cir. 2001) ("Hypothetical possibilities are not materially adverse employment actions.").

Finally, Jones's belief that UHG's decision was an excuse to fire her if she refused to

work with D.U. in the future does not change the outcome.  As already discussed, absent a clear

signal that an employee "would inevitably be terminated," *MVM, Inc.*, 2018 WL 2197727,

at *12, the mere possibility of future termination does not suffice for constructive discharge.

### c.  *Application of the Work-from-Home Policy*

Jones's final constructive discharge theory relies on the allegedly inequitable application

of UHG's telecommuting policy.   According to Jones, Robertson and Christman

"inconvenienced" her and other black employees "by strictly construing the [work-from-home]

policies."  (Opp'n M.S.J. at 18.)  Jones argues that "[o]nly Black and African American

employees were treated in this manner," while "[s]imilarly situated Caucasian employees" were

"permitted to work from home [up to] three days per week."  (*Id.*)

The Court need not determine whether the evidence supports Jones's contention that

UHG granted and denied work-from-home privileges on a racially discriminatory basis.  Even if

---

[13]     The Court does not discount the subjective distress the possibility of such an assignment appears to have
caused Jones.  She described the situation as "beyond uncomfortable," saying that, "even to this day[,] . . . I still feel
it," and that "[i]t made me even more uncomfortable that my superiors would think it was okay."  (Jones Dep.
at 86:5–15.)  Feeling personally disregarded by supervisors or fearful of an emotionally harmful work environment
may be reasonable bases for resigning.  But, sympathetic or not, subjective reactions do not control the constructive
discharge test, and a valid reason falls short of showing that circumstances *compelled* resignation.  *Green*, 136 S. Ct.
at 1776.  A resignation can be reasonable without amounting to constructive discharge.

true, a general practice of applying the work-from-home policy more stringently to black employees than to white employees would not provide a basis for Jones to personally claim constructive discharge. The record is undisputed that Jones was required to report to the office on February 11, 2016. But, she was not otherwise denied usual work-from-home privileges— she telecommuted regularly until she resigned. (Jones Dep. at 204:19–21, 205:3–4.) Refusing a single work-from-home request is not objectively intolerable. *See Byrd v. Vilsack*, 931 F. Supp. 2d 27, 42 (D.D.C. 2013) ("[D]enial of a request to work from home is not, in and of itself, an . . . adverse action."); *cf. Gbenoba v. Montgomery Cty. Dep't of Health & Human Servs.*, Civ. No. A.2003-2231, 2005 WL 1490008, at *10 (D. Md. June 23, 2005) (denying two leave requests was not actionable); *Dailey v. Lew*, Civ. No. GLR-15-2527, 2016 WL 1558150, at *7 (D. Md. Apr. 18, 2016) (improperly deducting leave on three occasions was not materially adverse).

Indeed, Jones's repeated characterization of the incident as an "inconvenience[]" belies any contention that the conduct was serious enough to constitute constructive discharge. (Opp'n M.S.J. at 18, 20.) Actions that "merely cause[] . . . irritation or inconvenience" are not actionable adverse events. *Spriggs v. Pub. Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. 2002); *see also Lindsey-Grobes v. United Airlines, Inc.*, Civ. No. GJH-14-00857, 2014 WL 5298030, at *6 (D. Md. Oct. 14, 2014); *Gbenoba*, 2005 WL 1490008, at *10.

Lastly, Jones cannot rely on her observation that other black employees were treated unfairly with respect to work-from-home policies—even if that observation were accurate. (*See, e.g.*, Opp'n M.S.J. at 18 (describing two black co-workers she claims were denied work-from-home privileges to "take care of sick children or themselves").) The Court does not doubt that it may be frustrating—and justifiably so—to witness treatment of colleagues that an employee believes to be discriminatory or unfair. But, such vicarious indignation cannot be the basis of

constructive discharge. Otherwise, any employee upset by any form of discrimination in the workplace could resign in protest and file suit. Such a possibility runs counter to Title VII jurisprudence emphasizing the need for incentives to report suspected discrimination early— incentives that would be undermined if employees could quit first. *See, e.g.*, *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 283–84 (4th Cir. 2015) (en banc) ("[E]arly reporting [is] vital to achieving Title VII's goal of avoiding harm."). This interpretation would also transform constructive discharge into the exceptional doctrine whose broad scope swallows all other limiting rules about the type of conduct actionable under Title VII. *E.g.*, *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) (requiring "as an absolute precondition to suit that some adverse employment action . . . occurred"), *cert. denied*, 475 U.S. 1082 (1986); *Chika*, 179 F. Supp. 2d at 585 (quoting *Settle v. Baltimore City*, 34 F. Supp. 2d 969, 989 (D. Md. 1999)) ("[N]ot everything that makes an employee unhappy is . . . actionable."). Far from embracing such a sweeping view, the Fourth Circuit requires constructive discharge claims to be "carefully cabined." *Honor*, 383 F.3d at 187 (quoting *Paroline v. Unisys Corp.*, 879 F.2d 110, 114 (4th Cir. 1989) (Wilkinson, J., dissenting in part), *vacated in part*, 900 F.3d 27, 28 (4th Cir. 1990) (en banc) (per curiam) (adopting Judge Wilkinson's rationale)). Under precedent, this Court must reject the claim that unfair treatment of Jones's co-workers constituted constructive discharge.

Because Jones did not adduce sufficient evidence of intolerable conditions to show constructive discharge, the Court need not decide whether she met the other elements of a prima facie case. UHG is entitled to summary judgment on Count I.

### 2. Hostile Working Conditions (Count II)

To establish a prima facie case of hostile working conditions, plaintiffs must show "(1) unwelcome conduct; (2) that is based on [a protected status]; (3) which is sufficiently severe

or pervasive to alter . . . conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Strothers v. City of Laurel (Strothers II)*, 895 F.3d 317, 328 (4th Cir. 2018) (quoting *Okoli*, 648 F.3d at 220). "The conduct at issue must be 'severe or pervasive enough to create an objectively hostile or abusive work environment' that is also 'subjectively perceive[d]' by the plaintiff as abusive." *Arije v. Pointcross Life Scis.*, Civ. No. JKB-18-3119, 2019 WL 652426, at *5 (D. Md. Feb. 15, 2019) (citations omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Courts should consider "all the circumstances" surrounding the unwelcome conduct, including "[its] frequency . . . ; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) (instructing courts to consider the "constellation of surrounding circumstances, expectations, and relationships," using "[c]ommon sense, and an appropriate sensitivity to social context").

The Fourth Circuit set a "high bar" for hostile work environment claims. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). Courts routinely reject claims premised only on "rude treatment," "callous behavior by . . . superiors," or "personality conflict." *Id.* at 315–16 (first quoting *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006); then quoting *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); then quoting *Hawkins v. PepsiCo., Inc.*, 203 F.3d 274, 276 (4th Cir. 2000)). Even "distressing" treatment that "has no place in a professional environment" may not be enough. *Chika*, 179 F. Supp. 2d at 588–89.

Under this count, Jones relies on similar evidence as her constructive discharge claim— that the CAP was unjustified, that it prevented her from pursuing transfers, that work-from-home policies were strictly construed against black, but not white, employees, and that she was

threatened with having to work with D.U. (Opp'n M.S.J. at 20.) Such conduct, though unwelcome to Jones, is not severe or pervasive enough to amount to a hostile work environment.

Jones's complaints about the CAP and the work-from-home policy bear similarity to a claim dismissed in *Strothers v. City of Laurel (Strothers I)*, 118 F. Supp. 3d 852 (D. Md. 2015). In that case, the court dismissed a claim alleging that the plaintiff was unfairly "accused of tardiness," "wrongly criticized" for violating the dress code, and given "negative feedback in her employee file and performance review." *Id.* and 864. There, as here, the crux of the claim was an unfair or overly stringent application of employment policies, coinciding with an allegedly unjustified performance review. Neither case involved conduct that "intimidate[d], ridicule[d], [or] maliciously demean[ed]" the plaintiffs based on their race. *Id.* (quoting *Engler v. Harris Corp.*, Civ. No. GLR-11-3597, 2012 WL 3745710, at *5 (D. Md. Aug. 28, 2012)). The alleged conduct did not involve racist language or symbolism, *see Boyer-Liberto*, 786 F.3d at 280, nor was it "physically threatening." *Harris*, 510 U.S. at 23. At most, like in *Strothers I*, Jones offers evidence of a "strict management style or degree of supervision," which, without more, is not actionable harassment. 118 F. Supp. 3d at 864 (quoting *Engler*, 2012 WL 3745710, at *5).[14]

The D.U. assignment does not provide a basis for this claim, either. Had Jones's supervisors assigned her to work with D.U. when they knew or should have known it was likely

---

[14]    Although not clearly relied on in her brief, Jones's deposition emphasized one comment in the initial CAP meeting that Jones suggested evidenced racial animus. According to Jones, when she accused Christman and Robertson of "treat[ing] black people different[ly] than [they] treat white people," Christman replied, "'They're just jealous because we don't use them. We use people that have been here longer than them.' Or something to that extent." (Jones Dep. at 143:20–24.) This comment is vague, especially without knowing the precise context or language used. And, even if Jones were correct that Christman meant "they" to refer to black employees, the statement is not intimidating, ridiculing, maliciously demeaning, or physically threatening. *Strothers I*, 118 F. Supp. 3d at 864. The Supreme Court has distinguished actionable harassment from "offhand comments and isolated incidents." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). In *Strothers I*, three such incidents were insufficient to create actionable harassment. 118 F. Supp. 3d at 864–65 (discussing disparaging comments about "'ghetto' people" and the airing of a Black History Month program that contained "upsetting or offensive" content, including racial slurs). The racial meaning of Christman's comment is ambiguous at best, and courts have found a hostile environment based on a single comment only if the racist connotation is clear. *See Boyer-Liberto*, 786 F.3d at 280 (collecting cases in which the single use of an "unambiguously racial epithet" was actionable). Jones conceded that she was never subject to any "racially derogatory remarks" while at UHG. (Jones Dep. at 158:19–23.)

to result in harassment, and had Jones been subjected to harassment, she might have had a claim under Supreme Court precedents, *see Faragher*, 524 U.S. at 788–89; *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013). The Court need not decide whether an assignment to work with an alleged past abuser could amount to a hostile environment without resulting in repeated harassment, because, in this case, Jones concedes that the assignment was withdrawn and there were no "specific plans" for another such assignment. (Jones Dep. at 81:20–23.) Under such circumstances, a statement by a supervisor, in civil terms, informing an employee of the bare possibility of such an assignment is insufficient to create a hostile work environment.

Therefore, UHG is entitled to summary judgment on Count II.

### 3. Retaliation (Count III)

To establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the . . . adverse action." *Strothers II*, 895 F.3d at 327 (quoting *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)). "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). The anti-retaliation provision is, therefore, "broader than the anti-discrimination provision," in order to "ensure[] that employees feel free to come forward with their grievances, even when a violation is not yet conclusive based on what [the employee] might know." *Strothers II*, 895 F.3d at 327.

Jones presents two retaliation claims: first, that the CAP was retaliation for her complaint about the work-from-home policy; and second, that the D.U. assignment was retaliation for her complaints of racial bias in her CAP. (Opp'n M.S.J. at 12–14.) The Court will summarize the evidence of a prima facie case but ultimately need not resolve questions about its sufficiency.

Even if Jones made a prima facie case, her retaliation claim would fail because she did not meet her burden to produce sufficient evidence of pretext in the final stage of *McDonnell Douglas*.

### a. Protected Activity

The first element, protected activity, "includes 'complaining to superiors about suspected violations of Title VII,'" provided that "the employee's perception of a violation [is] 'objectively reasonable' under the circumstances known to her." *Strothers II*, 895 F.3d at 328 (quoting *Boyer-Liberto*, 786 F.3d at 282). Protected activity includes "utilizing informal grievance procedures" and "voicing one's opinions . . . to bring attention to" prohibited conduct. *Jenkins v. MV Transport., Inc.*, Civ. No. TDC-14-0702, 2018 WL 558603, at *5 (D. Md. Jan. 25, 2018) (quoting *Laughlin v. Metro. Wash. Airport Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)); *see also DeMasters v. Carillon Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (endorsing an "expansive view of what constitutes oppositional conduct"). If an employee has a reasonable belief that a Title VII violation "is in progress," an internal complaint is protected activity, even if a claim based on the underlying conduct would be unlikely to succeed. *Boyer-Liberto*, 786 F.3d at 282.[15]

UHG first argues that the February 10 complaint was not protected activity because it did not mention racial discrimination. (M.S.J. Mem. at 26.) But, the lack of explicit reference to race is not dispositive. The Fourth Circuit has recognized retaliation claims where a plaintiff did not directly refer to a protected characteristic if a reasonable employer "should have understood" that the nature of the complaint was discrimination. *See, e.g.*, *Strothers II*, 895 F.3d at 336–37 (reversing summary judgment where there was a genuine question of fact whether the employer

---

[15] For this reason, it is not dispositive that denials of work-from-home requests and negative performance reviews are not generally actionable adverse events in a discrimination claim. *See, e.g.*, *Byrd*, 931 F. Supp. 2d at 42; *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377–78 (4th Cir. 2004). A tangible employment action like termination is rarely the first sign of discriminatory bias, and Jones did not need to wait for her suspicions about discrimination "in progress" to culminate in an ultimate action before reporting her concerns. *Boyer-Liberto*, 786 F.3d at 282. The remedial purpose of Title VII requires that employees be protected for early reports, "before [discrimination] rises to the level of" a Title VII violation. *Id.*

knew a "harassment" complaint referred to race-based harassment); *Okoli*, 648 F.3d at 224 (vacating summary judgment where the supervisor would have known the nature of the alleged mistreatment was sexual harassment). Here, racial dynamics were implicit in the circumstances: a black employee complaining that she and another black employee were treated unfairly, while another "type of person" like their white colleague was afforded liberal privileges under the same policy.[16] (Feb. 10 Emails at 3.) COB Analytics Group was a sufficiently small team that Jones's supervisors could be expected to know the named employees' races. (Jones Dep. at 46:24–47:9.)

Second, UHG argues that Jones could not have had an "objectively reasonable" basis for her February 10 complaint, because she did not know the specific circumstances of work-from-home decisions concerning L.B.W. and S.A. (M.S.J. Mem. at 26.) But, Jones need not have perfect knowledge to be protected; the applicable standard is whether her belief was reasonable "under the circumstances known to her." *Strothers II*, 895 F.3d at 329. Thus, L.B.W.'s actual working arrangements or UHG's basis for rescinding S.A.'s privileges are not dispositive. The question is whether, based on what she knew, Jones could have reasonably believed that L.B.W. was granted exceptional privileges denied to black employees.[17] Here, Jones and two co-workers reported that L.B.W. told them and others that she worked from home to care for a sick

---

[16]     Jones's email read:

> I've noticed there is a difference in how certain situations are treated for certain people. [L.B.W.] would work from home and/or leave early on several occasions but when [S.A.] was out due to illness her work from home day was taken away from her. [L.B.W.] was also allowed to make up time that she missed. To me this appears to be an imbalance/inequity. It's quite unfair. Please help me understand in what situation or what type of person I have to be in order to be afforded . . . work from home without negative consequences.

(Feb. 10 Emails at 3.)

[17]     Title VII protects against retaliation for opposing unlawful conduct. 42 U.S.C. § 2000e-3. Thus, Jones, personally, does not need to be understood as one of the mistreated employees, because "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . discrimination," it "virtually always" constitutes opposition activity. *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 281–82 (2009) (Alito, J., concurring in judgment) (quotation marks omitted). Her email could be protected activity even if viewed as a complaint about discrimination against S.A. *See, e.g.*, *DeMasters*, 796 F.3d at 418–20 (finding an employee's report of discrimination against co-worker to be protected activity).

child and that this occurred more than once per week. (Jones Dep. at 153:17–21; S.A. Dep. at 29:12–30:13, Pl. Exh. 4, ECF No. 14-4; C.L. Dep. at 21:23–22:7, 23:2–10, Pl. Exh. 5, ECF No. 14-5.) By contrast, S.A. repeatedly had difficulty securing out-of-office time for childcare and family responsibilities, which she discussed with Jones. (Jones Dep. at 151:9–12; S.A. Dep. at 7:11–17, 72:11–74:9, 77:15–23, 107:4–110:18.) S.A.'s work-from-home privileges were revoked shortly after she returned from sick leave. (S.A. Dep. at 98:8–100:21, 103:4–19.) Taken together, this evidence could support a reasonable belief that a race-based double standard existed between L.B.W. and S.A.

Similarly, when considering whether Jones had a reasonable belief that her CAP was racially motivated, the relevant question is not whether her performance was, in fact, satisfactory but whether, based on what she knew, it was possible for her to have reasonably believed that the CAP's performance criticisms were illegitimate. *See, e.g.*, *Reeves*, 530 U.S. at 147 ("[It] can [be] reasonabl[e] [to] infer from the falsity of [a performance-based] explanation that the employer is dissembling to cover up a discriminatory purpose."). Here, Jones's Common Review the month before rated her as "meet[ing] expectations." (Common Review at 5.) The Review also included expressions of approbation. (*E.g.*, *id.* at 1–2 (highlighting successful work on specific tickets); *id.* at 4 (noting that Jones "responds in a timely manner," "readily accepts feedback," and has "adapted to new systems and processes well"). Although it included an explicit criticism of her internet and phone use (*id.* at 4),[18] other language was ambiguous, phrasing feedback to highlight opportunities for growth, rather than warn of current inadequacy. (*See, e.g., id.* (suggesting that Jones "seek out training to enhance her knowledge, skills, and abilities," "look for ways to streamline processes," and "become more in tuned [*sic*] to the

---

[18] Jones's repeated insistence that other employees used their phones and the internet as or more often than she did are also consistent with a subjective belief that her conduct was at least comparable to her peers'. (*See, e.g.*, IDR File at 4–5; Jones Dep. at 100:10–101:5.)

clients. . . to increase productivity").)  The language in Jones's Interim Review was similarly oblique.  (Interim Review at 4–5.)

The record also suggests that, with respect to tickets later cited in the CAP, her supervisors failed to clearly communicate at the time that her performance was problematic.  In one case, the CAP form alleged that Jones "could not provide an acceptable update" on a ticket, which then had to be reassigned when Jones "stated she could not work on it."  (CAP Form at 2.) Emails show that, in fact, Jones responded to the update request by saying she was focused on two higher-priority tickets, and Robertson replied, "That's fine," and "Ok, thanks."  (IDR File at 20–21.)  Robertson then offered to reassign the ticket because it had been "pushed to priority." (*Id.* at 20.)  Robertson never stated or even strongly implied that Jones's responses had been unacceptable or that reassignment would be a black mark.  Email chains on other tickets cited in the CAP similarly show a lack of clear communication about expectations or assessments of Jones's work.[19]  The combination of some positive feedback, a "meets expectations" overall score the previous month, and a lack of clearly expressed concerns could suggest a reasonable basis to believe that her performance had been acceptable to date.

The Court will assume, for the purposes of this motion, that these facts at least raise a triable question of fact about the reasonableness of Jones's belief when she made the complaints.

### b.  Materially Adverse Action

The second element of the prima facie case is a retaliatory action.  The employee must show that the allegedly retaliatory action was materially adverse—that is, that it "'might have

---

[19]     In another example, the CAP cited an incident in which Jones had to be reminded about a new data pull process as an example of her failure to follow policies.  (CAP Form at 2 (referring to a February 23, 2016, communication).)  The corresponding email chain shows that Jones emailed Robertson to request for a data pull for the ticket, and Robertson replied that she would "see who is available."  (IDR File at 11.)  An hour-and-a-half later, Robertson circulated an email outlining new process requirements for requesting a data pull.  (*Id.* at 15.)  There is no record of any clarification about whether her earlier request needed to be resubmitted in the new format.

dissuaded a reasonable worker' from engaging in protected activity." *Strothers II*, 895 F.3d at 327 (quoting *White*, 548 U.S. at 68). Unlike in a discrimination claim, an employment action "need not 'affect the terms and conditions of employment'" to constitute retaliation. *Id.* (quoting *White*, 548 U.S. at 64). But, to be materially adverse, the action must cause harm that is "significant," not "trivial." *White*, 548 U.S. at 68. The anti-retaliation provision does not "immunize [an] employee from . . . petty slights or minor annoyances." *Id.* at 68. The material adversity inquiry is fact-based: "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69.

UHG argues that neither Jones's placement on CAP nor the D.U. assignment constituted a materially adverse action. (M.S.J. Mem. at 26–27.) Courts have recognized that both disparate discipline and retaliatory work assignments can be actionable events. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir. 1985); *White*, 548 U.S. at 70–71. Jones's supervisors denied that a CAP is disciplinary, and the policy itself does emphasize a curative purpose of helping employees "understand and correct" behavior. (CAP Policy at 1; *see also* Christman Dep. at 110:18–20.) But, it also repeatedly highlights disciplinary consequences, including termination. (CAP Policy at 1.) The restriction on transfers is also relevant, given that Jones had a pending application. (Jones Dep. at 160:18–19.) These factors could suggest material adversity. *See, e.g.*, *Lowman v. Md. Aviation Admin.*, Civ. No. JKB-18-1146, 2019 WL 133267, at *8 (D. Md. Jan. 8, 2019) (concluding that "a barrier to promotion opportunities would dissuade a reasonable employee from" making a complaint); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 780–81 (D. Md. 2010) (finding that actions impeding an employee's pursuit of an open position could be materially adverse); *cf. McNeill v. Bd. of Governors of the Univ. of N.C.*, 837 F. Supp. 2d 540, 544 (M.D.N.C. 2011) (finding a negative

evaluation with financial consequences to be materially adverse). With respect to the D.U. assignment, the history of Jones's prior complaint would weigh in favor of finding that the assignment may have been materially adverse under the circumstances. *White*, 548 U.S. at 71 (quoting *Oncale*, 523 U.S. at 81) (directing courts to consider materially adversity "from the perspective of a reasonable person in the plaintiff's position"). But, that potential adversity is lessened by the fact that the assignment was rescinded, making a future assignment speculative. *See Probst*, 25 F. App'x at 472.

Again, the Court need not resolve this question, but, as with the first element, will assume for the purposes of this motion, that Jones raised a question of fact on adversity.

### c. *Causation*

Finally, meeting the third element—causation—is "not an onerous burden" at the prima facie stage. *Strothers II*, 895 F.3d at 335. Close temporal proximity between the protected activity and the adverse action "is sufficient to establish a causal connection at the prima facie stage." *Id.* at 336–37; *see also Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017). The temporal proximity here is sufficiently close. UHG opened Jones's CAP five weeks after her February 10 complaint; the D.U. assignment occurred ten days after her verbal accusations of race discrimination in the CAP and four days after her first formal, internal complaint. Courts have found a lapse of two months or less to be sufficiently proximate to make a prima facie showing of causation. *Vicino v. Maryland*, 982 F. Supp. 2d 601, 614 (D. Md. 2013); *see also Lowman*, 2019 WL 133267, at *8 (finding one month sufficiently close).

Temporal proximity is "measured from when the employer learns of the protected activity," *Lowman*, 2019 WL 133267, at *8, which means that the employer's knowledge of the protected activity is "absolutely necessary" to causation. *Dowe v. Total Action Against Poverty*

*in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). Christman and Robertson both claimed not to have understood the February 10 email to raise a discrimination complaint. (Christman Dep. at 82:1–5; Robertson Dep. at 82:15–84:1.) But, there is no evidence in the record about Page's interpretation, and he is described as an ultimate decision-maker for the CAP (Christman Depo. at 105:20–22). Because there is circumstantial evidence that the racial nature of the complaint could be inferred from context, and because witness credibility is a quintessential jury question, the Court assumes there is a question of fact with respect to UHG's knowledge.

Even if the retaliation claim met all elements, however, it would fail at the pretext stage.

### d. UHG's Legitimate, Non-Retaliatory Explanations and Pretext

An employer's burden of production in putting forward a legitimate explanation is low. *Burdine*, 450 U.S. at 252–53 (describing the burden as one of "articulat[ion]"). To rebut such an explanation, the plaintiff must show both "that the [employer's] reason was false and that [retaliation] was the real reason" for the challenged action. *Foster v. Univ. of Md. E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)); *see also Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (requiring "but for" causation in a retaliation claim). UHG proffers a non-retaliatory motive for each of the challenged events. First, UHG claims that the CAP was motivated only by legitimate concerns about Jones's performance, which predated her February 10 complaint. (M.S.J. Mem. at 26–29.) Second, UHG claims that its handling of the D.U. issue was a neutral "operational decision" and that Robertson did not know about the past harassment complaint when she initially assigned D.U. to work with Jones. (*Id.* at 27, 29.)

First, the Court considers UHG's performance concerns. If UHG had legitimate, pre-existing concerns, Jones's February 10 complaint would not "insulate[] [her] from the

consequences of . . . poor performance." *Ziskie*, 547 F.3d at 229; *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [actions] upon discovering that a [complaint] has been filed.").[20] According to Christman, as early as the 2015 Interim Review, she considered Jones's performance to be borderline, stating that Jones "was just meeting our expectations," but that she "require[d] a lot of follow-up, almost to the point of micro-managing." (Christman Dep. at 51:5–13.) She also described repeated issues with Jones failing to "complet[e] her work [in a] timely [manner]" (*id.* at 121:13–14) and failing to notify Christman when she would be "away from her desk" for reasons that were "not work-related" (*id.* at 44:22–45:7). Both Christman and Robertson reported observing Jones playing games on her phone and looking at non-business-related websites during the workday. (*Id.* at 94:7–11; Robertson Dep. at 113:10–20.) According to Christman, she and Page had a "verbal conversation" about placing Jones on a CAP in January 2016 but decided to give her an opportunity to improve. (Christman Dep. at 107:7–20.)

These testimonial accounts are corroborated by at least some contemporaneous documentation. Jones's Common and Interim Reviews, although far from frank in their criticisms, are nonetheless consistent with Christman's account of Jones's performance as marginal, and far from strong. The Common Review scores, although rounded up to a "3," technically averaged 2.8, which reflects performance below expectations. (*Id.* at 110:4–5 (incorrectly stating the average was 2.6).) Christman and Robertson's observations of Jones's cell phone and internet use are also mirrored in two anonymous internal complaints filed in March 2016. (Def. Exh. 18, ECF No. 13-20 (describing inappropriate phone use daily)). This evidence is more than sufficient to meet UHG's burden of production in the second stage. While

---

[20] Evidence offered by UHG that Jones's "attitude became extremely negative and . . . created tension" *after* the CAP (M.S.J. Mem. at 23) is irrelevant to determining UHG's initial motives in opening the CAP.

courts sometimes may "view the assertions of the allegedly biased supervisor's assessments with caution, where, as here, the official's account is 'corroborated . . . by . . . contemporaneous notes,' . . . courts will accept the legitimate" explanation. *Miller v. Kramon & Graham PA*, Civ. No. GJH-15-1081, 2018 WL 722825, at *6 (D. Md. Feb. 2, 2018) (quoting *Davis v. Mabus*, 162 F. Supp. 3d 467, 476 (D. Md. 2016)).

Jones offers several arguments in response, but none succeeds in rebutting UHG's explanation. First, Jones repeatedly asserts that she "[did not] have any performance issues." (*E.g.*, Jones Dep. at 160:4.) But, her own assessment is not credible evidence of her performance. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). "It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Id.* (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996)).

Jones next argues that her supervisors failed to discuss performance criticisms with her prior to the CAP. (Opp'n M.S.J. at 14.) But, even if true, failure to discuss concerns is not evidence that such concerns did not exist. More importantly, Jones did not affirmatively dispute that some performance issues were raised prior to the CAP. She stated only that she could not recall conversations on particular performance-related topics. (Jones Dep. at 104:13–23 (stating that she did not remember any coaching about internet and cell phone use or "the need to engage [with her] peers more").) She also admitted to having been "counseled" in weekly meetings with Christman throughout her tenure, although she characterized these sessions as "counseling not in a negative way[,] but more [as in] looking for opportunities." (*Id.* at 105:3–8.) Finally, Jones offers no evidence to counter the two anonymous complaints, hypothesizing only that they might have been lodged by co-workers close to Robertson, at Robertson's request. (*Id.* at 91:14–15.) Lack of recollection and bald speculation cannot raise a credible dispute of fact.

Jones offers three other pieces of circumstantial evidence to suggest that retaliation, not performance, was the real reason for the CAP, but all fail to raise an inference of pretext. First, Jones highlighted a reference to the February 10 email exchange on the CAP form. (CAP Form at 2 (listing the exchange under "prior communications").) Jones argues there was "no reason to include this matter in the CAP other than to retaliate." (Opp'n M.S.J. at 15.) But, the inclusion of the email exchange on a list of communications between Jones and her supervisors occurring during the prior weeks does not suggest that the email exchange itself was the true motive for opening the CAP or that all other concerns listed in the CAP were insincere. Notably, the CAP contained criticisms that Jones "was not aware of procedural changes or policies" applicable to the workplace, and the emails about the telecommuting policy are listed alongside other communications bearing on current policies, such as the new data pull process, the need to notify supervisors when leaving the workspace, and internet usage. (CAP Form at 2.) The Court cannot infer a retaliatory motive from the reference in this context.

Second, Jones argues that, because Robertson assessed her performance as eventually improving "even though [it] had not changed," the CAP was "arbitrary" and unrelated to performance all along. (Opp'n M.S.J. at 15.) But, Robertson's changing assessment of Jones's performance does not indicate that the initial criticisms were pretextual. Even if Jones's insistence that she did not change her conduct indicated that the later finding of improvement was inaccurate, at most, this could suggest that Robertson was a poor judge of work quality. Even if true, this would not prove Jones's case. The relevant question is not whether UHG's assessment of Jones's performance was *accurate*, but whether it was the real reason for the CAP. "[I]t is not [the court's] province to decide whether the [stated] reason was wise, fair, or even correct, ultimately, so long as it truly was the reason" for the challenged action. *Hawkins*, 203

F.3d at 279 (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Even if the Court were to find a genuine dispute as to whether Jones's performance was as poor as UHG claimed, a faulty performance assessment could still have been the real reason for the CAP.

And third, Jones argues that another employee placed on a CAP for improper internet use was disciplined only after a "security pull" found that he "viewed 3,500 pages over the internet in one day," but that she was not similarly investigated first. (Opp'n M.S.J. at 18.) Jones also asserts that her colleagues in the COB Analytics Group were "permitted unfettered internet access." (*Id.*) Although a plaintiff may raise an inference of an improper motive by relying on so-called "comparator evidence," the Fourth Circuit requires that "[t]he similarity between comparators . . . be clearly established." *Swaso v. Onslow Cty. Bd. of Educ.*, F. App'x 745, 748 (4th Cir. 2017) (per curiam) (unpublished) (quoting *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)). Comparators must be "similar in all relevant respects," including by having the same supervisors, being subject to the same performance standards, and having "engaged in the same conduct without [meaningful] differentiating or mitigating circumstances." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (per curiam) (unpublished) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Here, Jones offers scant details about the other employee placed on a CAP. Christman described him has her employee (Christman Dep. at 98:18–21, 100:2), but there are no other details about his position or performance. The fact that an employee who engaged in more excessive misconduct was subject to a CAP does not establish that CAPs are inappropriate for less severe conduct, such as the type of which Jones was accused. With respect to the unnamed employees granted "unfettered access," Jones offers no evidence other than her own unsupported assessment of the extent of their internet use, and she provides no evidence that they were

similarly situated with respect to other factors, including supervisory concerns about the speed or quality of work on tickets. While Christman identified two other employees who had used the internet excessively but were not placed on a CAP, she asserted that they "immediately changed" their conduct after concerns were raised. (*Id.* at 98:12–16, 99:6–18.) The March 2016 internal complaints about Jones suggest that her behavior did not similarly improve after her Common Review. (Def. Exh. 18.) Even viewed in Jones's favor, the evidence does not support an inference that retaliation, rather than performance, was UHG's true motive for the CAP. *See Foster*, 787 F.3d at 252 (quoting *Jiminez*, 57 F.3d at 378).

The Court next turns to the D.U. assignment. Robertson testified that she did not know about the harassment complaint or the agreement not to assign Jones and D.U. to work together when she assigned him as the data analyst on Jones's ticket. (Robertson Dep. at 185:13–14.) Jones offers no evidence that Robertson did, in fact, know. (Jones Dep. at 215:15–20 (stating that she did not know whether Robertson knew about the past complaint or not).) It would be irrational to infer a retaliatory motive where there is no evidence that the person taking the action had knowledge of the facts or circumstances that would make the action materially adverse to the employee. *Cf. Featherson v. Montgomery Cty. Public Schs.*, 739 F. Supp. 1021, 1025–26 (D. Md. 1990) ("As a matter of logic and fact, a person cannot make an adverse, retaliatory decision based upon information of which s/he is unaware.").

Jones also argues that the later decision that she might have to work with D.U. in the future overruled a prior determination not to assign them together at all, and that the only possible explanation for this change was retaliation. (Opp'n M.S.J. at 15.) In support, Jones cites statements from Robertson's deposition in which she said that she was "hurt" by Jones's allegations of racial discrimination and found them "very upsetting." (*Id.*; *see also* Robertson

Dep. at 195:1–11.)  These comments are insufficient to show that Robertson was motivated by her own hurt feelings and not by neutral, operational concerns.  Robertson's email memorializing the decision stated "business needs" as the reason a future assignment was possible and suggested that the ultimate decision came from human resources, not from Robertson personally. (Pl. Exh. 9.)  And, at the same time, Robertson re-assigned a different data analyst to the project, removing the immediate need for Jones to work with D.U.  (*Id.*)  Taken together, the evidence is insufficient to show that UHG's non-retaliatory explanation "was false[] and that [retaliation] was the real reason" for the decision.  *Foster*, 787 F.3d at 252 (quoting *Jiminez*, 57 F.3d at 378).

Because Jones failed to adduce evidence to rebut UHG's legitimate explanations for its actions with an inference that they were pretext for retaliation,[21] she did not carry her burden in the third stage of *McDonnell Douglas*.  UHG is therefore entitled to summary judgment on Count III.

## IV.  *Conclusion*

For the foregoing reasons, an Order shall enter granting Defendant's motion for summary judgment.

DATED this 29th day of April, 2019.

BY THE COURT:

_____/s/_____
James K. Bredar
Chief Judge

---

[21]     Jones's discrimination claims also rely on the CAP and the D.U. assignment to establish objectively intolerable or abusive conditions under Counts I and II.  Had these claims survived the prima facie stage, they likely would have failed for the same reasons discussed here—Jones did not bring forward sufficient evidence to raise a triable question of fact about whether UHG's proffered explanations were pretext for racial discrimination.